The next case we're here is number 2007-1428 Proveris Scientific v. Innovasystems Mr. Pazan? Did I pronounce it correctly? Or is it Pazan? Pazan, okay. We'll go with that, Mr. Pazan. You can start whenever you're ready, but the clock won't start to run until the first word exits your mouth. Your Honor, I see the clock says 15 minutes. I think when we checked in downstairs, we noted that we would reserve 3 minutes for the call. Oh, yes. I have that up here. You have a total of 15 minutes, 12 main and 3 rebuttal. The yellow light will come on when you get down to 3. May it please the Court. As Your Honor noted, I'm here with Mr. Schuheidt. We represent Innovasystems, and we come to the Court from the appellant's side of the courtroom. And the reason we're on the appellant's side of the courtroom is because Judge Young in Boston put us there. Every issue in this case that was submitted to the jury worked out Innovasystems' way. And in framing the issues that, from our perspective, we think that the Court would be interested in, it's important to see how we ended up with that jury verdict. We briefed. There were cross motions for summary judgment on the issue of anticipation. There were cross motions for summary judgment in this case on the issue of obviousness. There were cross motions for summary judgment on the application of Section 271E1 to this case. And each and every one of those issues remained in the case through the selection of the jury on the Monday of the trial by the U.S. Magistrate Judge that Judge Young had asked to do that for him. Those issues remained in the case until five minutes before the opening statements were given, when, quite frankly, Innovasystems started losing the issues that put us at the appellant's table. The first major issue that we lost was the issue of 271E1. Judge Young said, simply, that it's not in the case, the cases don't go that far. We then began to lose the obviousness issue and the anticipation issue in a trial that consisted of a reversal of the order of presentation of proofs. Do you read Judge Young as basically saying, assuming arguendo, you infringe, the safe harbor provision of 271E1 does not reach or encompass your infringing activity, so you lose, you would lose? And that seemed to be, I guess, what… Yeah, there's a certain amount of speculation that we have to engage in because all Judge Young said was that the cases don't go that far. But isn't that basically what he must have been thinking? Now, I asked him at that time, the record will contain the question and answer, I asked him for an exposition so that we would have more information to talk about today in anticipation of the fact that we might be here. And he said that it was my right, it was our right to have that, but we never got it. So that's all we have. So we put ourselves in that position and we assume that. And, quite frankly, literally, he's right. The cases, as they existed at the time that we argued the issue, didn't go that far. But the only reason they didn't go that far was because, quite frankly, nobody ever asked either this court, the Supreme Court, or any of the district courts that handled 271 to go that far. And we can come in and we can talk about Medtronics, we can talk about all those cases, but, quite frankly, we would submit to the panel that we shouldn't have to. Because the statute itself is clear and suggests that we don't have to go to those other cases. Because the statute says, it says patented invention. It doesn't say patented drug. It doesn't say, I mean, we have the other cases here that talk about method patents, the peptides involved in, I think it was the center cut case or whatever it is. But we don't have to go that far because the statute is clear. Well, the statute is, when you say the statute is clear, that suggests that there's a nice crisp line that one could define and say that one particular product or invention would be on one side of the line and another on another side of the line. But when you go, and the briefs are full of these kinds of examples, so this is nothing new coming from me. And I'm sure you've thought long and hard about how to deal with some of these examples. But I have a very hard time seeing that the statute is clear with respect to at least products that might be a little farther out, but still reasonably related to the process of investigation that leads to the submission to the FDA. Such as, let's just take one example, a cell phone that you use exclusively in the laboratory to communicate with other members of your team. Suppose that cell phone actually has patented components. Does it fall within this nice, crisp, clear statute or not? Your Honor, that is, I contemplated starting the argument about 271 with just that kind of question. All right. Because it's posed by the attorneys. Now the question is on the floor, what's in one word, yes or no? The answer is, yeah. It's correct. Here's why. Now, that's an extreme. Now that we have that example, can I take another one? Suppose the car that one of the scientists used exclusively to get to the lab. Covered? All patented components in the car? We're moving into somewhat more of a... Of course we are. But that's the problem with the statute, which as you say is clear, but I'm finding difficulty finding clarity. That may be the problem with the statute. But with all due respect to this panel and to the Supreme Court and everybody else that's talked about the statute, it's Congress's obligation to draft a clear statute. It's Congress's obligation to correct the law if Congress thinks that the law is wrong. But the statute exists as it is. Let me focus on the... But you would say yes to the car example as well? No. OK, what's the difference between the cell phone and the car? Because, Your Honor, you're putting me in the position of a juror. And as a juror, if I were to say, is the car reasonably related? My factual conclusion based on what I know about cars and about how people get to work and whether or not the car is necessary to develop the data that's submitted to the FDA, I say no, that's not reasonably related. Yeah, but I want to put you not in the position of a juror, but in the position of a judge because we have to make this determination, so I'm going to ask you to make it first. As a matter of law... That is to say, what's your instruction to the jury? You have to come up with instruction. And you will say, reasonably related means. Ah. And what do you say after that? That includes the cell phone but excludes the car. Your Honor, I remember some 20 years ago going to school over here, and the first thing that they said to me was that the reasonable man doesn't exist. So I submit that any suggestion of what reasonably related means is difficult. And sure, judges are going to struggle with that. But I think that they give us an example where they talk about a laptop, for example. Let's suppose that in this particular case we have these three components, basically, of the device. We have a camera, we have a computer, and we have a laser. Let's suppose, now, I asked Dean Oferina to try it. I said, is there a patent on the cameras? I think so. Do you own it? No. Is there a patent on it? None of the components were patented by Dean Oferina. It's a combination patent, quite frankly. And the other issue that I wanted to get into is that in light of the KSR case that came down last year, I think that the easier way out of this, quite frankly, for the panel, is really the obviousness issue and not necessarily the 271E1 issue. But that 271E1 issue is so sexy for us as lawyers and maybe as a panel, as an appellate panel, that it overshadows the entire case. And we think pharmaceuticals, pharmaceuticals, pharmaceuticals. Not necessarily the case. But supposing, in putting this device together, we were going to build a camera from scratch. Would that camera be exempt from infringement under 271E1? The answer is yes. Judge Rader from this court would say, as he said in his defense, I'm sorry, his dissent, in the entire case, he would say, well, what happens to the research tool industry? What happens to people who make these cameras? What are we going to do to their patent rights? And where would their incentive be to develop a new camera? Well, there are other uses outside the pharmaceutical industry, outside of the activities that are reasonably related to developing data for the FDA. FDA under a federal law regulating drugs. Does that make those other uses infringing uses? Yes. They would remain infringing uses. So you need to distinguish. When you sell a product, you sell it to person A, he goes out and takes pictures of the Grand Canyon with the camera. You sell it to B, and he takes pictures of a result in a lab, which eventually might be used for an FDA submission. How do you distinguish that? Can you then all of a sudden be implied in one, not in the other, selling an infringing product, but not both? Your Honor, yes, we would let the fact finder decide whether it was reasonably related to submission of data before the FDA, unless the judge were to decide, the trial court judge were to decide, that there was no material issue of fact on that issue. In this case, there is no material issue of fact on the issue, because everybody agreed. Reasonably related in what respect? Well, in this particular case, let's go to the concrete example before us. In this particular case, the divide, the supposedly offending products, infringing products, were sold to three pharmaceutical companies, and there is not one single bit of evidence anywhere in the record to suggest that they were sold for any reason other than to assist those companies in developing data, which ultimately would be submitted to the FDA or whatever under some law regulating the approval of drugs. So, in this particular case, there is no fact for a jury to decide. You think that the term reasonably related, then, is a jury question, unless there's no grounds for disagreement? Under most circumstances, yes. But the jury charge that was submitted by the trial court in the Integra case was essentially approved, implicitly, in the decisions. And that jury charge talked about a preponderance of the evidence and asked the jury, I think it was more likely than not, or they said, or a decent or reasonable chance or something to that effect. So, what you're saying, if we say that this is a factual question, you could have exactly the same device in the District of Massachusetts, the trial on Monday, be held to be reasonably related, but the same device in the trial in the District of Rhode Island by a different jury would be held not to be reasonably related. And both would stand. Well, I think that it would depend, in some respects, on the principles of Reis, Giudicata, Collette, and Stoplin. Those don't apply to factual determinations by a jury. I mean, the jury would find on the facts presented in trial number one that X was the case. A different jury has a different take of it. Theoretically, Your Honor, yeah, that might work. But in this particular case, I don't think that that would happen because, quite frankly, this is basically a combination patent. And under the principles of Section 103, it's completely obvious. And the first judge that handled the case in this particular case should declare that the patent is invalid as a matter of law because it's obvious. This patent – and, you know, I wanted to – I'm sorry to put us in more questions or debate about 271E1. Let's continue on 271 for a minute. What about interpreting reasonable, making it instead reasonably necessary? Does that make a difference? I think it would be a mistake, Your Honor. No, would that make a difference? No, it would not make a difference. First of all, it would be a mistake because the statute doesn't say that. And second, the cases that are out there – I think there's one case, for example, that talks – it might be an Integra versus Merck case where the peptides – oh, no. Yes. In the case of Merck v. Integra, the peptide cell interactions patents or whatever it was for the preclinical research were ultimately not submitted to the FDA. So the question there was whether or not the 271E1 exemption would apply if, in fact, the data wasn't submitted. Does it really need to be submitted in order to be within the safe harbor provision? No, it does not need to be submitted to be within the safe harbor according to that holding. In my example, if we went forward, let's assume for the moment that you needed a spectrograph type of a microscope, and that particular microscope was necessary for you to make the results, and that's patented. But you also had a microscope which was not patented which you could also use. Does that make a difference as to what element you selected, one being patented and one not being patented, if you had the choice of both? If we assume for the sake of Your Honor's question that the two microscopes, although one is patented and one is not, are equally capable of arriving at a particular result, then, first of all, I would say that it really doesn't matter whether or not there's a patent on the one or not. 271E1 isn't going to constrain the choices of the laboratory technician. But then, to answer the other question, if, in fact, we used the patented microscope, we assembled it and infringed on it, theoretically, by doing so, can we hide behind 271E1's exemption if, in fact, the data doesn't go to the FDA or anyone else? Let's assume that I'm doing experiments with the microscope and my results are completely unsatisfactory. And I look at the results and I say, this is a disappointment. I'm not going to submit this to the FDA because it doesn't support my commercial goal of developing this drug. I'm not going to get approval based on these results. So I've determined, no, I'm not going to submit the data. Am I still protected from infringement claims under 271E1, even though I didn't submit the data? And the answer is yes. You can't know at the front end of the research or the preclinical activity or whatever it is what the results of your research are going to be until it's over. So it would be inappropriate to make that the test as to whether or not you've infringed or not. Should we make the test a little bit more difficult in the sense that any patented product which is, in fact, used in research must be combined in the information which is submitted to the FDA? In other words, if I have a chemical and it's a patented chemical and I use that chemical in my research and then it combines with the result which I submit to the FDA, is that what the safe harbor provision should be limited to? If I understand that question correctly, assuming that I do, my answer is that while it would be squarely under the confines of 271E1, no, that's not what it should be limited to. 271E1 on its terms isn't limited. Well, it says reasonably related to the development and submission of information in the federal law which regulates the manufacturing use and otherwise. That's right. So it's submissions. You need to submit the data which is developed from a patented invention which is used in the research. Reasonably related refers to both the development and the submission. But reasonably related doesn't mean actual submission. Reasonably related. So, for example, if we go back to this particular case, if Inova Systems carelessly, willy-nilly, without any concern, sold the allegedly infringing devices to Acme Manufacturing not knowing what Acme Manufacturing was going to do with them, then you might say, and I'm giving Proveris the benefit of the doubt here to some extent, you might say that 271E1 would not prevent an injunction against either Acme for abusing it in an infringing way or against Inova Systems for selling any more of them to Acme because there would be no reasonable relationship in that case to the development of data or the submission of data to the FDA or under any other federal law. But the language is not really clear, is it? As Judge Bryson stated at the beginning, it's not very clear at all because it says solely for uses reasonably related to the development and submission. So reasonably related could be meant to define only the development and not submission. So it's a structural statutory ambiguity that needs to be resolved. It's not clear at all. Well, this, Your Honor, is a case where that structural ambiguity is not going to be an issue because there is no evidence in this case that these allegedly infringing devices were being sold for anything other than the development of data which could potentially be submitted to the FDA. So this is not the case that the panel should rely on to make that adjustment in the statutory language. And then I would then add to that is, quite frankly, with all due respect, the panel shouldn't be making that adjustment anyway. Congress would be making it because patented invention means exactly that, patented invention. But quite frankly, as I said before, I don't think that the panel ever really needs – I'm over my time, but quite frankly, I don't think the panel ever needs to even get that far. Unless there's another question. Did you want to say anything about obviousness? Yes, I did. Mr. Prezant? I did, and what I wanted to say was that because, as I said before, this 271E1 argument is interesting from an academic point of view, we're looking at this case, and I'd submit that we're all looking at this case as a 271E1 case, and I don't think it is really. At the first instance, it's really an obviousness case. This is a simple combination patent. And last year in KSR v. Teleflex, the Supreme Court came and basically said to this court, said, look, whatever artificial or mechanical tests you have thrown away, look at our 40- and 50-year-old decisions, Great American Tea Company v. Supermarket Equipment, Anderson's Blackrock, and Secreta. Look at these cases and determine whether or not there's really any inventiveness. The device in question here is no more ingenious, no more encompassing inventiveness than this podium. Somebody came along and decided that they were going to put this here, they were going to fix this here, they were going to run the cables through the thing to make a better podium for attorneys to stand before this court to argue. I see a sign there that says patent. Patent. Maybe this is patent. Maybe this is patent. The combination of the podium plus the lights. The specter of 271E1 makes us think pharmaceuticals, pharmaceuticals, pharmaceuticals. But quite frankly, and it doesn't seem like it at first, the case that this is the most like is the Anderson's Blackrock v. Pavement Salvage case from 1969. And in KSR opinion, the Supreme Court talks about their case, and it's still good law. And in that case, all the pavement contractor did was take previously known elements and bolt them to a chassis so that they would work as an integral unit. And quite frankly, that's all that Proveris did in this particular case. The invention described in the patent is just previously known elements that, as the one opinion says, would be hanging around the walls of the inventor's workshop and bolted them to a chassis so they would work better. And as I said to the jury, we all know that if you want to take a better picture, you get a better camera. If you want to take a better picture, you get more light. And if you want to take even a better picture, you affix it and you make it so it doesn't move. So this is a completely obvious patent under KSR. The combination, as the Supreme Court said, the combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results. And that's exactly what happened here. Colloquially, as I was thinking about it, it occurred to me that in some respects the answer to the obviousness question in the combination patent is somewhere along the lines of if you said, of course, of course, it makes perfect sense to do that, then it's obvious. On the other hand, if you say, I would have never thought of it, then perhaps there's some inventiveness there. And I think this is in the, of course, it makes perfect sense to do this. Well, there's an intermediate field, which I guess consists of, of course, now that I see it, I can see why wouldn't I have thought of it? And the Supreme Court cautions us and says, don't engage in it. I think the Supreme Court would agree that that would be inventiveness. The fact that it's simple, now that you look at what somebody else has done, and you say to yourself, how could I not have thought of that? How could no one have thought of it? Doesn't mean it's not patentable. Perhaps, but the Supreme Court cautions us about that in the case of opinion and also says, basically turns around the old thought that they mentioned that if it was obvious to try, that doesn't make it obvious and suggests to us that, yes, if it's obvious to try, that might in fact mean that it was obvious. Let me ask you one very brief question about the infringement issue. Unfortunately, it appears to be things said not on the record that seem to be at least floating around here. I guess you were the trial counsel involved here. Did you acknowledge to the trial court that there was not a tribal issue on infringement? You might also ask, Your Honor, Mr. Pezzan, why did you waste the first two minutes of your argument talking about how the case was teed up for trial and what happened right before the opening statements? And what I would suggest to the court is that the statements on the record are the statements that are on the record. But I asked Judge Young, and this is in the transcript, I asked Judge Young for the opportunity to argue to the jury that the basic proofs had not been established. And I think we had an oral argument on whether or not there would be a directed verdict. I think it was during the context of that oral argument. And I said to Judge Young that I didn't believe that they had established the basic elements. Judge Young said that he thought that it was a very close issue and that all they had was a reasonable interest. I'm talking about before the trial. The way this played out, I take it, is that there was at least some understanding that this was not a contested issue in the case, infringement, with respect to several of the claims. Now, did you say, is it your position that you never said anything that would have given anyone the impression that this was not an issue to be tried? Your Honor, the briefs and the record stand as it is. Well, I want your characterization of them. My characterization of them is that poor trial counsel put in a position of thinking that he was trying an entirely different case than the case he ultimately was told to try five minutes before he was told to give his opening statement. Should be excused from making certain tactical decisions based on what a trial court judge tells him he is going to have to do during the week of the trial. We refer to Tuesday of that trial as the Tuesday massacre. And with all due respect to Judge Young, who's an engaging and interesting character, the trial and the way it was conducted, in my opinion, amounts to, quite frankly, a miscarriage of justice because we are here at this table because Judge Young put us here, not because any reasoned assessment of the facts put us here. Thank you. Thank you, Mr. Pazan. Before you start, Ms. Freeman, let's see. Mr. Pazan had 15 minutes and then an additional 12, and we'll restore his three minutes of rebuttal. So that means he will have had a total of 30 minutes. If you need that amount of time, you'll have the same. Thank you. One moment. Ready when we focus on her. Good morning. Thank you, Your Honors. With me today also is my colleague, Gary Greenberg. Susan Hanna, as you know, on behalf of Program of Scientific Cooperation. I'd like first to do away simply with Your Honors' questions regarding whether or not Inova conceded on the record to infringing certain of the forms. Well, there was an in-camera, there was an in-chambers discussion, and there's nothing, there's no transcript of that. Is that the issue here? I don't think it is the issue at all. That statement was raised as for context purposes only. Proverbs is not relying on the in-chambers conversation in any way. There is very explicit and numerous implicit places in the trial record where it is clear Inova conceded infringing Claims 3 through 10 and 13, the first of which occurred after our opening statement when the court asked Mr. Paison to clarify, and our counsel, Mr. Demon, asked to clarify a statement that trial counsel had made during the opening, and I'll quote to Mr. Demon. Yes, you said they, meaning Inova, don't dispute infringement, save as to Claims 1 and 2. Mr. Demon, you're correct. The court now to Mr. Paison, and that's correct, Mr. Paison, is it? In other words, you, Inova, win on those if you're going to win because they're anticipated or obvious, but otherwise they're infringed, right? Mr. Paison, correct. Another explicit concession came from their expert, Attorney Quinn, not from counsel who was put on the spot by a change in the judge's decision, a perceived change in the judge's decision regarding St. Howard. That later statement came when asked during his cross-examination by Attorney Demon, quote, we realize there's no issue with respect to infringement as to Claims 3 through 10 and 13 of the assertive patent. Mr. Quinn, I do. Those explicit references in the numerous implicit points in the trial where Inova failed to object to even the court's statements to the jury regarding concession to the infringement of those claims should do away with that issue altogether. I would like to address the safe harbor issue since it seems to be a hot topic of conversation. I'm also welcome to address any other questions if the court has them in regard to participation. One preliminary question I had, Ms. Winn, the term research tools is used. It appears in the briefs and it's used in some of the cases. That's not a term that has any statutory basis. It's just a term that has developed from litigation in various cases. Am I correct or incorrect on that? You're correct, Your Honor. It seems to be floating around in the background of a number of cases. Judge Rader focuses it on extensively in his dissent in the Integra case. That's correct. Each of the cases that deals with the safe harbor deals with a product or a medical device. A product as that term is defined in section 156. The Supreme Court in the Eli Lilly case and also in the Merck v. Medrano case and this court in the Aptos case have all provided that when construing the statute, which is, of course, a question of law, you first take a look at the legislative history of the statute and the purposes for which it was enacted. In the cases where this court and the Supreme Court have done that, they have looked at the fact that the provision was enacted to address two patent distortions. The first, section 156, dealt with the reduction in a patent term that was caused by premarket regulatory time delays, if you will. The second distortion occurred at the end of the patent term where generic pharmaceutical companies, which is the basis for the whole legislation being passed, in effect could not start to use a reference drug maker's patent until the patent expired. That created, in fact, an extension of the patent term, and for competitive reasons, Congress stepped in to allow generic pharmaceutical companies to compete as they should as soon as the patent is over. Each of the cases that addresses the safe harbor addresses only medical devices, drug products, and in one case, a veterinary biological product, but only products as that term has been defined under section 156. In fact, in the Eli Lilly case, the court stated that the two sections are, quote, summarize the Eli Lilly court's decision by stating, quote, in determining which products fit within the bounds of section 271E1, the court looked to the far more explicit section 156, and the court and ad hocs followed that same analysis to determine whether or not safe harbor provision applies. But in 271E1, they didn't say patented medical interventions. They said a patent convention. That's correct. So how should we limit that? Are you saying we should be limited to specifically the two areas of medical uses and medical devices? It's a little bit more than two, but yes, Your Honor. It should be limited to those patented interventions that fall within the definition of products as defined in section 156. Why? Because the statute, when the Hatch-Waxman Act was enacted, Congress was looking to address a specific concern in the market that generic companies felt in the fact that they could not compete from the day that a reference drug manufacturer's patent expired. In order to remedy that situation and because of the patent statute and the de facto patent term extension that the reference drug companies enjoy, in order to remedy that so that for competitive purposes the generic companies could actually compete when they should have been able to compete under the patent law, Congress enacted what has resulted in safe harbor provision. They did that in connection with also enacting section 201 in Hatch-Waxman Act. 201, 202 are 156 and 271E1. In the Murk and the Eli Lilly case, the Supreme Court has stated that when you're construing a statute, you need to look at not only its legislative history but the statutory scheme as a whole. When you look at the statutory scheme as a whole, it's clear, as the Supreme Court stated, that the sections are meant to be complementary. They should be looked at in the same way. And there's very good analysis in the Murk v. Integra Supreme Court case where the court goes back and forth and looks at some of the changes that have been made to the statute where it first did not include, I believe, its veterinary biological products, and then it was added back in, and the same change was made in 271E1 to allow that limited area of immunity for patent infringement. Now what ANOVA is really asking this court to do is to take two giant leaps outside of the provision. They're saying, okay, court, create a new class of infringers so that a third party that has no immediate, no direct engagement in the development and submission of information to the FDA is immune from patent infringement solely by limiting its customer base to companies that may be engaged in that and that may use it. That's a different argument from the product argument you were just making. That's the party argument. That's the second. They're really asking the court to take two giant leaps. The first one is the product. All right. But before you get beyond the product and moving into the party issue, if you've got, let's say, a direct chemical precursor, a necessary chemical precursor of a drug, that would not, I take it, be within the definition of product under 156 because it's not a drug product in the sense that the term is used, the active ingredient of a new drug, et cetera, et cetera. So it wouldn't be a product. Maybe. If you're assuming that the chemical is not an active drug. The chemical precursor is not itself an active ingredient. It's just something that you use to make the ultimate chemical that is the product, that is the drug. But it's a necessary precursor. There's a patent on that. And there's a patent on that. Is it your position that the use of that precursor is not immune? Because it's not a product. If it's a necessary component to it? It's a necessary. Not a necessary component. A necessary chemical precursor. Okay. If the entity that is actually using it for purposes of developing and submitting information to the FDA, then they're probably covered. Why? Because it's not a product. I thought your argument was that it had to be a product. It's not a product, right? That's probably where the inherency in the brief, what we state in the brief, is that what should be included in the patent inventions that should be protected from patent infringement by virtue of 271E1 are the products that are listed in 156 and what is inherent to the development of a drug. Now, that's where everything gets sort of murky, it seems to me. Because inherency, I don't know why inherency should apply, let's say, to the chemical precursor, which is the easiest way to get from A to B, let's say, versus some mechanical device that is effectively necessary to making the reaction go. Well, let me clarify that inherency, and it's been referred to at least in blogs as inherency standard, wasn't anything. There are two cases that raise a question I think this is coming from, the first of which is the Merck v. Integra case. And there were certain peptides that weren't used ultimately for submission, certain ones that were. In that case, those peptides, based on my read of those cases, were in fact drug products. Right, but my example is one in which it isn't a drug product. Then I don't think it is covered. So you would say... It has to stay within the bounds of what Congress intended when it set out to eliminate the patent term distortions that were... But isn't that exactly what Congress had in mind? Because otherwise, then Company B, which is trying to get its product developed in a timely fashion, is foreclosed from doing that because it can't use the very precursor that's critical to the production of the good. I disagree. And the reason why I disagree is because the very basic reason for this statute was for generic pharmaceutical companies to be able to use the patented drug compound of the reference drug maker so that they would have their generic version ready to go when that patent expired. And it has developed into also including medical devices, which I believe is entirely consistent with the legislative purpose and, in fact, the reasons for enacting it, because medical devices also require pre-market regulatory authority... Excuse me, approval. And they also... The manufacturers of medical devices were in the exact same position, in effect, that the generic drug manufacturers were by being foreclosed from using a patented medical device until it went off pat. So I think that limiting the statutes reached to just those products that are listed in 156 is entirely consistent with what Congress intended and, in fact, is entirely consistent with every case that's out there that's been decided by the Federal Circuit and the Supreme Court. Do you think... Just to interrupt, if I may, for just a moment, and I won't pester you further. Well, I can't propose that. Pester or what? I take it you don't agree with your opposing counsel that the question of whether something is reasonably related is a question of fact for the fact finder? I do agree with... I agree with you, I disagree with that statement. The analysis first is a question of law. Does the statute extend to the particular situation I'm hearing? Is the statute interpreted in a way that the infringer and the device, bad word, and the patent invention at issue fall within the reach of the statute? That is the very first question that the court, any court, has to address when 271A1 is raised. Once you get to the point where the judge determines, yes, statute applies, yes, everything is copacetic as far as that goes, if then there is a question as to whether or not, for instance, a party's sale of a medical device at a convention, which is in the Teletronics case, there was some sales made for investigational devices in order to bring clinical investigators in to perform required testing. If that action is reasonably related, then I think that there is case law that suggests if there's a question of fact regarding whether a particular action was or was not reasonable, it might go to the jury. That's the situation that I believe counsel was referring to. Do you mean as in if it was sold to three different companies, one of which is constantly involved in submission to the FDA and two others that are only occasionally in the machine? The question of whether the machine, the question of whether it is, is not actually being used 100% of the time in connection with the submission process? Precisely. Okay, that is a different question. How do we take a look at 271E, which speaks only to drugs and not to devices, medical devices? How can we expand that? You're saying it's covered by 156. So anything that's covered by 156 should also be incorporated in 271E. 156 defines product as a drug product and medical device and veterinary, biological. I don't have the exact language here. Well, it says any medical device, right? Food additive, color additive, subject to regulation under federal food. And then the term drug product means the active ingredient of. Does not speak to anything of medical devices except in the first paragraph. Right. So with respect to that, then are we saying that even though the 271E is limited by its language to information of federal law which regulates the manufacturer use of sale of drugs or veterinary biological products, it doesn't speak to medical devices. Well, that's the Eli Lilly case. The Supreme Court determined through a very lengthy, well-reasoned analysis that the same reasons why generic drug manufacturers should enjoy immunity from limited patent infringement should also apply to medical device developers because medical device developers would be in the same type of situation, generic for lack of better word. Do you think Justice Scalia went back to legislative history on that point? His favorite source of insight. He did. There was, I would say, a fairly thorough analysis of it. Of legislative history. Because that's the only way you can really interpret that language is by going back to legislative history. Is that correct? So now, if in fact we look at it from that perspective, why can't we say that a research tool would also involve a patented device which is used in the process of developing information which is to be submitted or not submitted to the FDA, like a microscope? Two reasons. First of all, at this point, I have found no definition of what a research tool is. It seems to be an invitation to create another class of immunized infringers and present an opportunity to create another class of business, an industry within an industry. And that's the industry of infringers. Because if an entity, like ANOVA, is allowed to buy a Dell computer, copy every screen, not copy, but just make its own equivalent, and enjoy immunity from infringing all the patents on the Dell computer solely by saying, oh, well, it's going to be used as a tool in a research lab, then the court will, in effect, be enacting additional legislation to create a class of infringers that can simply sell to the license classes. A class of non-infringers, I guess. A protected class. Exactly. A protected class. And create an industry of infringers. Simply by limiting its customer base to sharing files, a glass of wine, a ton of pharmaceuticals. Suppose we don't agree with you that product is the proper definition. We think that something like my example of the chemical precursor was intended to be covered, but it isn't a product. Therefore, we can't agree with you on that. And we go to the question of reasonably related. Can you give us any guidance as to how you think that term should be defined, setting aside the product line? Sure. Based on the case law, I would say reasonably related means that there must be some nexus, if you will, to the specific infringing use that is connected, directly connected to the development and submission of information to the FDA. Now, example of what isn't reasonably related, and this is addressed in, for instance, the Teletronix case, which is Teletronix pacing systems versus Ventrotex. It is cited in the paper. It's 982 F. 2nd, 1520. And one of the issues that ANOVA has raised, and it comes up in here, is whether simply a sale or some type of use that is just because of the disjunctive term or falls within the statute simply because it's being sold or it's being used in some way by a pharmaceutical company, in this case. In the Teletronix case, the court makes it clear that there has to be more than just a commercial reason for the sale. There has to be a nexus. And, in fact, it states in that case, it cites, excuse me, the court cites to FDA regulations that explicitly allow for medical device developers, in that case, to sell an item and recover its cost of development and the cost of the system itself. The nexus, substituting the word nexus for the word related doesn't move me along the path very far, frankly. Let me give you an example and see how you respond to this and whether you think this satisfies the nexus requirement. A product such as Taq polymerase is used to immense advantage in genetic engineering. It enables you, you may be familiar with the technology, probably more familiar than I am, but in any event, it facilitates the production of genetic materials at a rate that was unknown before and has, in effect, given rise to a very important industry. It's opened the door to many, many inventions in that area. Now, let's suppose Taq polymerase is patent protected. Would there be a nexus between Taq polymerase and the ultimate product that is produced through the use of Taq polymerase as a means of producing the product? It isn't a precursor as such, but it is the mechanism by which the ultimate product can be produced in a reasonable period of time and in sufficient volume. If I understand your question properly, I would say no. It's not covered. Because if... Even though no one could possibly produce the product in any reasonable period of time without using this particular enzyme. I would say no. No. And why? Why isn't there a nexus there? Because the patent holder, if it's not a product, it does not fall within the original reasons why 271E1 was enacted. Right. Remember, we're walking away from product for now. I want to know why this... Reasonable use. Right. Understood. A patent holder is presumed to have monopoly rights. Limited, but monopoly rights. And as suggested by Judge Rader in, for instance, the dissent in the Tanger case, those rights need to mean something. They are stripped away when 271E1 applies to provide some infringement with immunity. But there has to be some point where there has to be a line. And I don't believe the cases have drawn it yet. But there has to be a line where a patent holder has to be able to enjoy the rights of having a patent. I don't disagree with anything you've said. What I haven't heard is why this particular example falls on the unprotected side of that line, i.e. why there is not a sufficient nexus here if we're looking for a nexus. Because it's simply making a particular job a little easier. Well, it's making it possible as a practical matter. It could have been done, but what takes three days in the lab now by using Taq polymerase would have taken five years before. It was undoable for all practical purposes. No nexus? I would fall back on who it is that's infringing the patent. And here's the reason why. Based on the statute, based on the reasons for the dissent provision and the reasons for the provision, there plainly was commercial incentive involved. And that incentive is to allow generic drug companies to compete when they should be allowed to compete. If the infringer is an entity that is directly developing a generic equivalent to a reference drug or the equivalent of a generic medical device. Perhaps. I won't concede it entirely because I don't know enough. I understand what your hypothetical is. But I still think there has to be a line where the patent holder has rights that aren't trumped by a perceived notion that speed, perhaps, is better. Speed to market is better in a way that pushes the envelope further than it's ever been pushed before. And I think in that case, the patent holder's rights trumpet. There is a particular statute that addresses what can and can't happen. And it isn't perfectly worded. That's been acknowledged by the Supreme Court in this court. We have to work with it. And the way we work with it is looking at its purpose and what it's intended to do. And the purpose is not to create a class of infringers that is beyond the class that is actually doing the development and actually submitting the data to the FDA. Ms. Farina, what would be the difference if we said instead of reasonably related as the statutory language is and interpret that to mean reasonably necessary to develop the product for the FDA or otherwise, removing itself from the nexus that you had mentioned before? I think changing the language from reasonably related to reasonably necessary would actually shrink the class of patented inventions that would be protected and the class of infringers. Why would it shrink instead of expanding it? Because if it is necessary in the purpose of the statute in order to develop the material and the submission to the FDA, isn't that a much better definition than reasonably related? Which could be a broader aspect of it. So I would presume that you would be arguing in favor of reasonably necessary. Reasonably necessary or maybe you didn't understand exactly what I meant. By adding the word necessary instead of just reasonably related, I think it's a stricter standard. I think that what would happen is in some of the cases there's discussion about the need for experimentation. And some of that experimentation, if it wasn't necessary, it was just experimentation, it's not going to be protected. And in some of the cases it might now be protected. Now there is dicta in the Merck opinion where the court states if a drug developer is doing nothing but basic research for basic research purposes without a specific intent to develop a particular drug or without an intent to cause the type of physiological effects that the researcher is intending to cause, then even in that case the infringement is not protected. Now with that guidance, it was not the holding admittedly, but with that guidance from the Supreme Court, one has to ask if even a drug developer that is just conducting research to conduct research isn't protected from patent infringement. How in the world can an entity that has absolutely no intent to develop a drug be protected? That's precisely what I know he's asking this court to do. But then if the statute is party driven, as you suggest, what's the word sale doing in the statute? When would the party that's submitting actually be engaged in any sales? That's brought up precisely in the Teletronics Pacing versus Ventrotex case, a case decided by this court. In that case, it was a medical device at issue, and in order to entice, in essence, entities to help with clinical trials for an investigational device, the company is allowed, and there are federal, there are FDA regulations that allow it, the company is allowed to actually sell it so it can recoup the expense of actually producing the device and recoup some of its development costs. The entity is not allowed to commercialize it, so they're not allowed to sell it for the sake of just selling it and making money. It has to be very specific to a clinical trial, and that is precisely why the words offer to sell or sell have to be in the statute. But you say it really means offer to sell non-commercially. That's how it was interpreted by the Aptos court. Ms. Farina, thank you. I think you got your, hopefully you got your full time. And let's see, Mr. Pisan, you have your three minutes of rebuttal. Yes, thank you, Your Honor. Just very briefly, and not in any kind of cohesive fashion, just some comments and some of the questions. Judge DeHart asked both me and Ms. Farina about the reasonably necessary formulation. And in sitting there thinking about it while Ms. Farina was answering it, it seems to me that another problem with that is that it's an ends-resulted test that doesn't really allow for scientific experimentation with error. Because what would happen if you read in a reasonably necessary requirement would be that in cases where the person that was using the patented invention, you know, where the research didn't bear out, didn't bear fruit, you could then say, well, it clearly wasn't reasonably necessary because you didn't submit any data based on your use of that thing to the FDA. And that wouldn't be fair. It would be kind of an anomalous result. It would almost encourage bad science. So I think that that's one of the other reasons why that's not, wouldn't be a good formulation. The other thing is at least one court has decided that something which I would say is hard to classify as product is included in it. Granted, it's only a district court. It's the Northern District. The Klassen immunotherapies versus King case in 2006, that was actually a method patent used to classify data towards development of new drugs. I would submit that if that method patent were used to classify data concerning widgets for the use in high-performance automobile engines, that it would not be included, obviously, in 271A1. So there are cases where the product, there have already been cases where the product is not a drug, where the class 3 medical devices, then the class 2 medical devices. So that's not an appropriate formulation either. Thirdly, the jury instruction is in the cases. There's only been one that we've been able to find. Neither the Supreme Court nor the Federal Circuit have had a problem with it. And then ultimately, just that issue with regard to Judge Young and the comments that we made on the record, even the quote that Ms. Farina gave to the panel said that Judge Young said, if you win on those, it's because they are anticipated or obvious. And I submit that Judge Young violated the rule of the case that he himself made. There was nothing new in the case that wasn't presented in the briefs. When we went into that trial, Judge Young had denied the motions for summary judgment. Tactical decisions were made by trial counsel, and then for no reason, arbitrarily or capriciously, Judge Young changed the rules. And I think that put us at a significant disadvantage. We thank God for the jury. Otherwise, we'd be in a lot worse position in the ring. Ms. Roseanne, thank you. Thank you. Ms. Farina, thank you. The case is submitted. All rise. The honorable court is adjourned for the day today.